# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MILLER-BRADFORD & RISBERG, INC.,

        Plaintiff,

      v.                      Case No. 06-C-1308

VT LEEBOY, INC,

        Defendant.

## DECISION AND ORDER ON PLAINTIFF'S MOTION
## FOR PRELIMINARY INJUNCTION

### I.  PROCEDURAL BACKGROUND

This action was commenced on December 19, 2006, when the plaintiff, Miller-Bradford & Risberg, Inc. ("MBR"), filed a complaint in the Waukesha County Circuit Court naming VT LeeBoy, Inc. ("LeeBoy") as the defendant.  Accompanying the plaintiff's complaint was a motion for a temporary injunction.  On December 26, 2006, LeeBoy removed the action to this court pursuant to 28 U.S.C. § 1441, based on diversity jurisdiction pursuant to 28 U.S.C. § 1332.  According to LeeBoy's Notice of Removal, MBR is a corporate citizen of Wisconsin and of no other state, and the defendant is a corporation that is neither incorporated in nor has its principal place of business located within Wisconsin and is therefore not a citizen of Wisconsin. Thus, there is complete diversity of citizenship between the parties.  Furthermore, "[t]he matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.00, in that, among other things,  the complaint claims 2006 sales of defendant's products by plaintiff in an amount exceeding $1,000,000,

1

together with a derivative sales impact that allegedly makes defendant's products 'extremely important' to plaintiff, a business with total annual sales of nearly $50,000,000; alleges wrongful termination of a claimed dealership; and seeks both monetary and injunctive relief, each component of which would have both a claimed value to the plaintiff and a potential cost to the defendant substantially exceeding $200,000." (Notice of Removal ¶ 7.)

In accordance with the parties' stipulated briefing schedule, which was subsequently amended by stipulation, the parties have filed briefs and other written submissions in support of their respective positions regarding the plaintiff's motion for preliminary injunction. Thus, the plaintiff's motion for preliminary injunction is now fully briefed and is ready for resolution. For the reasons which follow, the plaintiff's motion for preliminary injunction will be denied.

## II. FACTUAL BACKGROUND

The parties have not filed a stipulation of facts. Instead, each has set forth in their respective briefs various facts, support for which facts they claim are found in the affidavits, deposition transcripts, and other documents that were filed with their briefs. A review of those written materials demonstrates that the following are the facts material to the resolution of the pending motion.

MBR, headquartered in Sussex, Wisconsin, has branch offices in Madison, Sturtevant, DePere, Eau Claire, and Abbottsford, Wisconsin, as well as Negaunee, Michigan and Rockford, Illinois. From these locations, MBR sells, services, and repairs equipment for use in the construction, road-building, and forestry industries. MBR has been in business since 1944.

LeeBoy manufactures commercial asphalt pavers, road graders, and an array of smaller, related products. Its principal place of business is in Lincolntown, North Carolina.

In 1998, MBR entered into a business relationship with LeeBoy. As of September 10, 2002,

2

that relationship has been governed by a written agreement (the "Agreement"). Under the Agreement, MBR became the exclusive dealer of LeeBoy asphalt pavers in the territory covered by the Agreement. This territory encompasses the entire state of Wisconsin, the upper peninsula of Michigan, and counties in northern Illinois.

Between 1985 and the beginning of the LeeBoy business relationship in 1998, MBR's average annual sales in the asphalt paving market was $665,248. In the years 1998 through 2006, MBR's average annual sales to asphalt paving contractors was $1,619,119. During that same time period, MBR added thirty-one contractors to its customer list in the asphalt paving market. (Soley Decl. ¶ 3.) LeeBoy's pavers range in selling price from around $50,000 to $150,000. (Patsy Decl. ¶ 2.)

In the period since the beginning of the business relationship in 1998, 120 asphalt pavers have been sold in MBR's territory. Of these, 75 have been LeeBoy pavers sold by MBR, and 45 were competitive pavers. (Soley Decl., Ex. B.)

MBR's sales of new LeeBoy products have fluctuated between 1998 and 2006. In 1999, MBR's sales of new LeeBoy products totaled $1,088,489. In 2000, MBR's sales of new LeeBoy products totaled $714,862. Between 2001 and 2005, MBR's sales of new LeeBoy products were in the middle six figure range, with a high of $646,765 in 2002 and sales between $441,424 and $477,011 for the other years. In 2006, MBR's sales of new LeeBoy products increased to $1,145,890. (Soley Dep., Ex. 1.)

As of late November 2006, MBR's revenues from the sale of new and used LeeBoy equipment and parts comprised 2.17% of MBR's total gross revenues up to that point in the year. In 2005, 2004, and 2003, total revenues from sales of LeeBoy products were .98%, .93%, and 1.2%,

Case 2:06-cv-01308-WEC   Filed 01/26/07   Page 3 of 23   Document 27

respectively, of MBR's overall gross revenues. (Soley Aff. ¶ 7.) During the period of 2004 through November, 2006, total revenue from sales of LeeBoy products represented 1.4% of MBR's total revenue. (Soley Aff. ¶ 7 and ¶ 15.)

The sum of the new LeeBoy whole goods sales for the period of 1998 to 2006 is $5,977,171. The sum of MBR's total new whole goods sales for all suppliers during this period is $317,810,929. Thus, new LeeBoy whole goods represent 1.9% of MBR's total new whole goods sales for this period. (Soley Dep., Ex. 1.) In 2006, MBR's sales were more than $60 million. Since at least 2000 MBR's sales have been in the $50 to $60 million dollar range. (Soley Dep. at 10, 12.)

MBR has not made any financial investments in its physical plant or other areas specifically tailored to LeeBoy products. MBR displays LeeBoy's marks and logos on its website, publications, and brochures, along with the logos of other suppliers. MBR has no signage identifying LeeBoy on the inside or outside of any of its eight facilities.

MBR does not have sales or service employees who exclusively work on LeeBoy-related duties, as MBR's staff are generalists. MBR provides after-sale service to customers who purchase LeeBoy products. This includes standard service and warranty work, as well as training seminars and assistance in using the machine and resolving potential problems.

MBR began selling a line of commercial asphalt pavers made by Blaw-Knox after entering into the business relationship with LeeBoy in 1998. MBR's sales of new Blaw-Knox whole goods totaled $12,462,754 for the period of 1998 to 2006. The parties disagree over whether these products are in direct competition.

On or about November 1, 2006, LeeBoy sent a notice to MBR of its decision to terminate the Agreement, effective December 31, 2006.

4

## III. DISCUSSION

In order to obtain a preliminary injunction, the movant "must demonstrate a likelihood that it will prevail on the merits of the lawsuit, that there is no adequate remedy at law, and that it will suffer irreparable harm without injunctive relief." *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005). "If these requirements are met, the court must then balance the degree of irreparable harm to the plaintiff against the harm that the defendant will suffer if the injunction is granted." *Id*. Moreover, the movant must show that the preliminary injunction will not harm the public interest. *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005).

### A. Likelihood of Prevailing on the Merits

To reiterate, "[t]o obtain a preliminary injunction a plaintiff must demonstrate a likelihood that it will prevail on the merits of the lawsuit." *Incredible Techs,* 400 F.3d at 1011. "A party with no chance of success on the merits cannot attain a preliminary injunction." *AM Gen. Corp. v. Daimlerchrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002) (citing *Kiel v. City of Kenosha*, 236 F.3d 814, 815 (7th Cir. 2000)). "In the first phase of the analysis, the court decides only whether the plaintiff has any likelihood of success--in other words, a greater than negligible chance of winning." *Id.* (citing *Washington v. Indiana High Sch. Ath. Ass'n*, 181 F.3d 840, 845 (7th Cir. 1999)). Once the court determines that there is some likelihood of success, "the analysis turns to a 'sliding-scale' under which a lesser likelihood of success can be made sufficient by a greater predominance of the balance of harms." *Id*. (citing *Ty, Inc. v. The Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)).

In order to obtain a preliminary injunction, MBR must demonstrate a likelihood that it will prevail on its claim for relief based on the Wisconsin Fair Dealership Law ("WFDL"). Wis. Stat.

5

§ 135. 01, et seq.  At issue is whether the relationship between MBR and LeeBoy was a "dealership" as defined by the WFDL at the time that LeeBoy gave notice of its intent to terminate the Agreement. Under the WFDL, a "dealership" is:

> A contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Wis. Stat. § 135.02(3)(a).

In the case at hand, the element principally in dispute is whether, between MBR and LeeBoy, "there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise."  The Wisconsin Supreme Court has laid out two general guideposts  "which, if satisfied, would lead to the conclusion that the parties shared a community of interest."  *Cent. Corp. v. Research Prods. Corp.*, 272 Wis. 2d 561, 581, 681 N.W.2d 178, 187-88 (Wis. 2004).  The first guidepost "is whether the parties share a continuing financial interest."  *Id.*, 681 N.W.2d at 187.  The second guidepost is "whether the parties share an interdependence, which may be characterized as 'the degree to which the dealer and grantor cooperate, coordinate their activities and share common goals in their business relationship.'"  *Id.*, 681 N.W.2d at 188.  (quoting *Ziegler Co. v. Rexnord, Inc.*, 139 Wis. 2d 593, 605, 407 N.W.2d 873, 879 (Wis. 1987).  "When construed together, these guideposts must reveal an interest in a business relationship great enough to threaten the financial health of the dealer, if the grantor were to decide to exercise its power to terminate . . . These stringent requirements are intended to weed out the typical vendor-vendee relationship."  *Id*.

6

The Wisconsin Supreme Court has enumerated ten facets with which to structure any inquiry into whether these two guideposts are satisfied:

> [1] How long the parties have dealt with each other; [2] the extent and nature of the obligations imposed on the parties in the contract or agreement between them; [3] what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services; [4] what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services; [5] the extent and nature of the alleged grantor's grant of territory to the alleged dealer; [6] the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos); [7] the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership; [8] the personnel which the alleged dealer devotes to the alleged dealership; [9] how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; [10] the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services.

*Ziegler*, 139 Wis. 2d at 606, 407 N.W.2d at 879-80.

This list is not all inclusive. *Id*., 407 N.W.2d at 880. Moreover, "[a] court must not restrict its inquiry to any one facet of the business relationship, but rather must examine a wide variety of facets, individually and in their totality, as evidenced in the actual dealing of the parties and in their contract or agreement." *Id.,* 407 N.W.2d at 879.

The parties disagree as to the weight that should be assigned to each factor, as well as whether the analysis of each of the facets supports a finding of a community of interest. MBR contends that the small percentages of revenues and profits it derives from LeeBoy's products are not determinative on the question of whether the parties shared a community of interest. Rather, MBR argues, despite the small percentage or revenues and profits, the other facets of the business relationship are sufficient to establish the existence of a community of interest.

MBR cites *Central Corp*. to support its contention that a small percentage of revenues and

7

profits should not be determinative. In *Central Corp.*, the Wisconsin Supreme Court held that, despite the fact that the plaintiff derived only 8% of its gross revenues from selling the defendant's products, enough other factors tilted in favor of the existence of a community of interest such that summary judgment was not proper. 272 Wis. 2d at 583, 681 N.W.2d at 189. Specifically, the court noted that the parties had a relationship of about 20 years, the plaintiff had made a significant investment by building a warehouse to store the defendant's product line, and the defendant limited the geographic area in which the plaintiff could sell the defendant's products. *Id*. at 565, 681 N.W.2d at 180.

In response, LeeBoy contends that the low percentage of business derived from LeeBoy's products is determinative to a finding that there is no community of interest, particularly in light of the lack of sunk investment by MBR in the selling of LeeBoy products. LeeBoy argues that particular attention should be given to factors which are especially crucial to a calculation of severe economic impact and risk to the alleged dealer's financial health. LeeBoy contends that the low percentage of revenues and profits, in combination with the lack of sunk investment in LeeBoy products, leaves almost no plausible scenario under which success on the merits of MBR's dealership claim is possible. As such, according to LeeBoy, the other facets of the business relationship would have to tilt extraordinarily in favor of MBR, and LeeBoy argues that these other facets also weigh against a finding of a dealership.

LeeBoy differentiates the case at hand from that in *Central Corp*. Specifically, unlike MBR in this case, the plaintiff in *Central Corp*. built a new warehouse to accommodate the defendant's products, devoted more time to the defendant's line than to any other line, had a relationship of 20 years, and a percentage of business (8%) substantially larger than the 1.9% involved in the case at

8

hand.  272 Wis. 2d at 565, 571, 576, 583, 681 N.W.2d at 181, 183, 185.

I conclude that LeeBoy is correct in arguing that the percentages of revenues and profits that MBR derived from LeeBoy's products, as well as the lack of sunk investment in LeeBoy products, are particularly important in determining whether there exists a community of interest.  The ten *Ziegler* facets merely structure an inquiry into whether there exists "a business relationship great enough to threaten the financial health of the dealer, if the grantor were to decide to exercise its power to terminate."  While a court must examine a variety of factors which help define a business relationship, factors which go to the heart of the issue of economic impact and financial risk should generally be given greater weight.

Indeed, while *Ziegler* outlined ten facets to be examined individually and in totality, the court acknowledged that "[a] low percentage is strong evidence, evidence that might ultimately be determinative in many cases, that there is no continuing financial interest between the parties in the operation of the business, and thus no community of interest."  139 Wis. 2d at 607, 407 N.W.2d at 880.

The Seventh Circuit, in interpreting the Wisconsin Fair Dealership Law, has given percentage of revenue and sunk cost primary emphasis when examining the totality of the circumstances.

> Our cases have distilled the principles underlying the Wisconsin cases, and provide that a community of interest may exist under one of two circumstances: first, when a large proportion of an alleged dealer's revenues are derived from the dealership, and, second, when the alleged dealer has made sizable investments (in, for example, fixed assets, inventory, advertising, training) specialized in some way to the grantor's goods or services, and hence not fully recoverable upon termination.

*Frieburg Farm Equipment, Inc. v. Van Dale, Inc.*, 978 F.2d 395, 399 (7th Cir. 1992); *see also Kenosha Liquor Co. v. Heublien, Inc.*, 895 F.2d 418, 420 (7th Cir. 1990) (holding that an overall loss

9

of 8% in gross "is still too small, when the firm has no assets dedicated to serving the brand in question.").

MBR argues that the analysis performed by the Seventh Circuit, namely its focus on percentage of revenues and amount of sunk costs, has been rejected by the Wisconsin Supreme Court in *Central Corp*. MBR contends that focusing on these two factors is contrary to *Central Corp*.'*s* mandate that the WFDL be governed by the ten facet test of *Ziegler*.

In response, LeeBoy contends that Seventh Circuit decisions do not abandon the ten facet test, but merely focus the analysis on the two facets which are most likely to be determinative. Federal courts have still looked at the other *Ziegler* facets to determine if they would alter the court's conclusions. *See Super Natural Distribs., Inc. v. MuscleTech Research & Dev.*, 196 F. Supp. 2d 761, 775 (E.D. Wis. 2002). Therefore, LeeBoy argues, Seventh Circuit decisions are still consistent with the Wisconsin Supreme Court decisions in *Ziegle*r and *Central Corp*.

I conclude that Seventh Circuit decisions, which emphasize the importance of percentage of revenue and sunk investment in a determination of community of interest, are still tenable in light of *Central Corp*. As discussed above, the court in *Ziegler* itself acknowledged the potential determinative value of a low percentage of revenue. Moreover, the court in *Ziegler* noted that "'[a] substantial investment is one way to satisfy the 'community of interest' requirement,'" and that "continuing financial interest in the distributorship may be exhibited . . . by [the plaintiff's] financial investment in the inventory, facilities and good will of the alleged dealership." 139 Wis. 2d at 607-8, 407 N.W.2d at 880 (quoting *Bush v. National School Studios, Inc.*, 139 Wis. 2d 635, 655, 407 N.W.2d 883, 892 (Wis. 1987)). Seventh Circuit decisions prior to *Central Corp*. do not ignore the ten facets, but rather point out the relevance of certain facets which shed particular light on the issue

10

of the financial health of the dealer.

As such, an inquiry into whether there exists a community of interest necessarily should start with an analysis of the percentage of business and sunk investment. In the case at hand, the percentage of MBR's gross revenues from the sale of LeeBoy products is quite low. New LeeBoy whole goods represent 1.9% of MBR's total new whole goods sales for the period of 1998 to 2006. During the period of 2004 through November, 2006, total revenue from sales of LeeBoy products represented 1.4% of MBR's total revenue. Indeed, even MBR concedes that these percentages, standing alone, would ordinarily not be sufficient to establish the existence of a dealership. (Pl.'s Br. at 8.)

MBR argues that receiving the right to sell LeeBoy pavers allowed MBR to offer the "turn-key" solution, in which paving contractors can buy all the equipment they need with one stop. (Pl.'s Br. at 2.) As a result of adding the LeeBoy line of pavers, MBR's annual sales in the asphalt pavement market increased by an annual average of $1 million.

However, even assuming that this $1 million increase was completely attributable to the addition of LeeBoy pavers, the percentage of gross revenue is still quite small in comparison to MBR's over $60 million of total annual revenue.

Moreover, MBR has a relatively small amount of sunk investment in the LeeBoy line of products. MBR has conceded that it has not made any financial investment in its physical plant or other areas specifically and uniquely tailored to LeeBoy products. Furthermore, MBR concedes that it does not have personnel dedicated solely to selling LeeBoy products, and that it does not have data on advertising or promotion expenditures specifically for LeeBoy products.

However, MBR contends that it has invested in goodwill in the asphalt paving market. It

11

points to the increase in annual sales in the asphalt pavement market as evidence of this goodwill, as well as the addition of 31 new customers since it began selling LeeBoy products. MBR argues that it will have no return on its investment in goodwill if LeeBoy were allowed to terminate the Agreement.

But, MBR has not described any particular investment it made in goodwill outside of the selling of the product. MBR cannot point to any specific financial expenditures it made to create this goodwill, outside of the general advertising and promotion that it does for all of its products.

The small percentages of gross revenues derived from LeeBoy products in combination with the lack of substantial sunk, illiquid investment strongly suggest that the loss of LeeBoy products would not threaten the financial health of MBR in a way that differentiates this relationship from that of a typical vendor-vendee relationship. This conclusion is further supported by the deposition testimony of MBR's President and CEO, John Soley, Jr. ("Soley"). Soley testified that MBR had a successful business prior to having a relationship with LeeBoy, and that he did not believe that MBR would go out of business with the loss of the LeeBoy product line. (Soley Dep. at 20, 81).

To be sure, there would be a negative impact on MBR's finances with the loss of the LeeBoy line. However, this potential economic loss is not to the extent such that LeeBoy has MBR "over a barrel." *See Home Protective Servs. v. ADT Sec. Servs*., 438 F.3d 716, 720 (7th Cir. 2006) ("The ultimate question is whether the grantor has the alleged dealer 'over a barrel'--that is, whether it has such great economic power over the dealer that the dealer will be unable to negotiate with the grantor or comparison-shop with other grantors.").

In sum, a first-step analysis of percentage of gross revenues and amount of sunk, illiquid investments indicates that the loss of the LeeBoy product line would not seriously threaten the

12

financial health of MBR.  Although this strongly suggests that the relationship is a typical vendor-vendee relationship rather than a dealership, the overall analysis does not end there.  Rather, as noted in *Central Corp.*, the other *Ziegler* facets must be examined to see whether the totality of the circumstances suggest a different conclusion.

## The Length of the Relationship

MBR and LeeBoy have had a relationship for approximately nine years.  Although this is a substantial period of time, it is tempered by the fact that MBR has been a successful business for over 60 years.  As such, this facet does not weigh strongly in favor of MBR's claim that there is a community of interest.

## The Extent and Nature of the Parties' Obligations

In arguing that this facet favors the finding of a community of interest, MBR points to Paragraph 3.1 of the Agreement, which defines the "Dealer Duties" of MBR.

> You agree to (a) employ and maintain a competent sales and service staff adequately trained on Products to carry out your responsibilities under this Agreement; (b) comply with all our policies, which we may amend from time to time; (c) use your best efforts to achieve your Sales Performance Goals; (d) maintain in your inventory a representative quantity of your authorized products lines; (e) stock parts according to a minimum schedule which we will publish from time to time; (f) in your discretion, display advertising material, promotional signage, and brochures as provided by us; (g) maintain adequate facilities to provide top qualify service of LeeBoy products; (h) vigorously promote sales of products; and (i) provide to us, at our request, a written report of your sales and inventory of products.

(12/7/06 Soley Aff., Ex. A, pp. 2-3.)

Although there is a wide range of duties presented in the above-quoted paragraph of the Agreement, these duties do not appear to be substantially more extensive than would be the case in any significant vendor-vendee relationship.  As noted by LeeBoy, there are no purchase or sales

13

quotas, no quantitative promotional requirements, no minimum inventory requirements, and no bans on the selling of competitive products. The purchase, sale, and promotion of LeeBoy products is largely in MBR's discretion. As a result, this facet neither favors nor disfavors a finding of a community of interest.

### The Percentage of Time or Revenue Devoted to LeeBoy's Products

MBR has not specified how much time or revenue it devoted specifically to selling LeeBoy's products, although MBR does state that they did an "excellent job of selling the LeeBoy line." (Pl.'s Br. at 9.) In contrast, LeeBoy asserts that MBR promoted competing products at the expense of LeeBoy products. (Patsy Decl. ¶ 7.) As such, this facet neither favors nor disfavors a finding of a community of interest.

### The Percentage of Revenues and Gross Profits Derived from the LeeBoy Line

As discussed above, this facet weighs heavily against a finding of a community of interest.

### The Extent and Nature of the Grant of Territory to MBR

MBR is the exclusive LeeBoy dealer in the state of Wisconsin, in the upper peninsula of Michigan, and in several counties in northern Illinois. This facet weighs in favor of a finding of a community of interest. However, this finding is somewhat tempered by the fact that this exclusivity was only one way. MBR could freely sell competing products in the assigned territory.

### Use of Trademarks and Logos

MBR uses LeeBoy's marks and logos on its website and on publications and brochures that MBR issues to promote its asphalt paving products. However, MBR did not use LeeBoy's name on any signage, and MBR displayed LeeBoy's name on its website along with the other suppliers whose products are sold by MBR. As such, this facet does not weigh heavily for or against a finding of a

14

community of interest.

### The Extent and Nature of the Financial Investment in Inventory, Facilities, and Good Will

As also discussed above, this facet weighs against a finding of a community of interest.

### Personnel Devoted to the LeeBoy Line

MBR concedes that it does not have any sales or service employees who spend all of their time working on LeeBoy-related duties. As such, this facet weighs against a finding of a community of interest.

### Expenditures on Advertising and Promotion

MBR states that it does not segregate its advertising and promotional expenses by vendor, and therefore lacks data on this factor. MBR also does not indicate that it has promotional efforts specific to LeeBoy. Therefore, this facet weighs against a finding of a community of interest.

### Supplemental Services

MBR lists a variety of supplemental services it performs in addition to service and warranty work. MBR conducts training seminars for customers on proper use of LeeBoy machines, and is active in a variety of steps to ensure that customers are able to properly use their LeeBoy machines after purchase. Although this information might on its face tend to support a finding that this facet favors a finding of a community of interest, its impact is unclear because MBR has not indicated whether these services were different from the services it offers customers for all of its products.

In the end, after examining the totality of the circumstances through an analysis of the ten *Ziegler* facets, I conclude that the relationship between MBR and LeeBoy does not appear to be distinguishable from a typical vendor-vendee relationship. Factors which are particularly indicative of a potential threat to economic health, such as percentage of revenues and sunk investment, weigh

15

heavily against a finding of a community of interest. Other factors, such as personnel not being devoted exclusively to the LeeBoy line and expenditures on advertising and promotion not being made exclusively on the LeeBoy line, also weigh against a finding of a community of interest. The remaining factors are either neutral or weigh only slightly in favor of a community of interest.

As such, rather than weighing substantially in favor of MBR's claim to dealer status, the other *Ziegler* facets support the conclusion already strongly suggested by the low percentage of business and sunk investment; namely, that this appears to be a vendor-vendee relationship in which MBR may suffer some detrimental economic impact from the termination of the Agreement, but not to such an extent as to give rise to a dealership relationship under the WFDL.

MBR also argues that, the *Ziegler* facets aside, LeeBoy has made a contractual promise to provide full WFDL rights as evidenced in a provision in the Agreement. Specifically, MBR points to paragraph 10 of the Agreement:

> Some states have laws that give you certain rights which may vary from, or are in addition to, those found in this Agreement. If your principal place of business is located in one of those states, this Agreement is deemed amended to the fullest extent necessary to provide you those rights.

(Soley Aff., Ex. A, p. 5.)

MBR contends that on its face this paragraph makes eligibility for protection turn only on whether the geographic location of MBR's principal place of business is in a state with a protective law. The Agreement does not specify that the Agreement is deemed amended to comply with the law only if the statute in question is found to apply to MBR. Therefore, according to MBR, because MBR's principal place of business is in Wisconsin, and the WFDL affords dealers with rights beyond those in the Agreement, LeeBoy has agreed under paragraph 10 to be bound by the

16

provisions of the WFDL. In addition, MBR argues that paragraph 10 is ambiguous, and must therefore be construed against LeeBoy, the drafter, and in MBR's favor.

In response, LeeBoy argues that paragraph 10 provides for any statutory rights that MBR would enjoy in the absence of paragraph 10 to be incorporated into the contract, but that statutory rights that would not apply by their own force do not become contractual rights by virtue of paragraph 10. Moreover, LeeBoy contends that there is nothing ambiguous about paragraph 10.

MBR's argument is unavailing. Although paragraph 10 provides MBR with additional rights that are given under Wisconsin law, it nevertheless is only logical that the Wisconsin law in question must be applicable to MBR in order to be given effect. Specifically, the WFDL must actually give MBR additional rights in order for these rights to be incorporated into the Agreement. After all, and as noted by LeeBoy, paragraph 10 would not automatically subject LeeBoy to any inapplicable statute in Wisconsin, such as the Wisconsin Marital Property Law. Such being the case, if the WFDL does not apply to the case at hand, paragraph 10 does not nevertheless somehow incorporate into the Agreement the rights set forth in the WFDL.

MBR also does not detail that which it alleges to be ambiguous about paragraph 10. Indeed, there does not appear to be any other way to construe this paragraph, other than that, in addition to those rights provided in the Agreement, MBR is provided any applicable rights under Wisconsin law.

In sum, I conclude that MBR is unable to meet the requirement of the first prong of the test for granting a preliminary injunction. MBR does not appear to have a "greater than negligible chance of winning" on the merits such that the granting of a preliminary injunction would be appropriate. An analysis of the totality of the circumstances under the *Ziegler* facets reveals that

MBR has failed to demonstrate a likelihood of success on its need to establish the existence of a community of interest. This conclusion is reinforced by the low percentage of business and minimal sunk investment, two of the leading factors in a determination of whether a community of interest exists. Moreover, even if MBR were able to demonstrate a likelihood of success on the merits of its WFDL claim, it cannot establish that there is an inadequate remedy at law or that irreparable harm will befall MBR if the injunction is not granted.

## B. Inadequate Remedy at Law and Irreparable Harm

The concepts of inadequate remedy at law and irreparable harm are interconnected. As the Seventh Circuit has stated, "[t]o say that the injury is irreparable means that the methods of repair (remedies at law) are inadequate." *Fleet Wholesale Supply Co. v. Remington Arms Co.*, 846 F.2d 1095, 1098 (7th Cir. 1988). Both parties agree that a showing that damages would be insufficient to make MBR whole would necessarily also constitute a showing that the harm is irreparable.

Under Wis. Stat. § 135.065, "any violation of [the WFDL] by the grantor is deemed an irreparable injury to the dealer for determining if a temporary injunction should be issued." The "deemer" clause creates a presumption of irreparable injury. *Fleet Wholesale Supply,* 846 F.2d at 1098. However, neither side argues that this presumption is irrebuttable, as MBR itself concedes that it still must show that damages would not suffice to make MBR whole. (Pl.'s Br. at 13.)

MBR argues that its loss of goodwill is sufficient to establish irreparable harm. As stated by the Seventh Circuit, "[t]he loss of goodwill and the disruption of [the dealer's] business resulting from its termination is substantial and sufficient to constitute 'irreparable harm.'" *Menominee Rubber Co. v. Gould*, *Inc.*, 657 F.2d 164, 167 (7th Cir. 1981).

In response, LeeBoy contends that MBR is not losing goodwill, but rather is sustaining

18

quantifiable losses of sales and profits. This loss, according to LeeBoy, is compensable by money damages.

"Goodwill is an intangible asset that represents the ability of a company to generate earnings over and above the operating value of the company's other tangible and intangible assets." *In re Prince*, 85 F.3d 314, 322 (7th Cir. 1996). "It often includes the company's name recognition, consumer brand loyalty, or special relationships with suppliers or customers." *Id.*

MBR argues that it has developed substantial goodwill in the asphalt paving market as a result of having the LeeBoy product line and doing an excellent job of selling that product line. Thus, the LeeBoy line has generated additional earnings for MBR in the asphalt paving market as a result of MBR's enhanced goodwill through selling LeeBoy products.

Whether MBR is losing goodwill or, instead, is simply losing quantifiable sales and profits is debatable. MBR provides statistics showing sales increases to asphalt paving customers after MBR acquired the LeeBoy line, but it is unclear how much of this increase is attributable to enhanced goodwill from selling LeeBoy products.

However, even assuming that this increase in sales is largely, or completely, attributable to enhanced goodwill, there is no indication that monetary damages would not repair the injury caused by the loss of such sales. The asphalt paving market constitutes a narrow portion of MBR's overall business, and the loss of goodwill in this particular area does not affect the sales for the rest of MBR's non-asphalt paving products. Moreover, in arguing for the existence of enhanced goodwill, MBR provides specific numbers to quantify the worth of the goodwill in terms of increased sales since the acquisition of LeeBoy products. Therefore, it necessarily follows that the loss of goodwill would result in quantifiable losses in sales and profits within a limited part of MBR's business,

19

which losses could be compensated through monetary damages.

Further, although there is a presumption of irreparable harm in favor of the dealer under the WFDL, "[f]or the presumption to apply, it is necessary that there be a dealership relationship." *Price Engineering Co. v. Vickers, Inc.*, 774 F. Supp. 1160, 1162 (E.D. Wis. 1991). As discussed above, it is questionable at best whether MBR and LeeBoy had a dealership relationship.

As such, even if MBR were able to demonstrate some likelihood of success on the merits of its claim, it has failed to show that there is an inadequate remedy at law or that it would sustain irreparable harm if the injunction were not granted. Simply stated, MBR has not demonstrated that monetary damages would not adequately compensate it for the lost sales and profits attributable to the absence of the LeeBoy product line.

## C. Balance of Harms

As stated above, a lesser likelihood of success can be made sufficient by a greater predominance of the balance of harms. In my opinion, however, the balance of harms in this case does not tilt so strongly in favor of MBR such that it would become sufficient to justify issuance of a preliminary injunction.

To be sure, MBR would suffer a negative financial impact from the denial of injunctive relief. As discussed above, however, this financial loss would be limited to a small portion of MBR's overall business. Moreover, MBR can offset the loss of the LeeBoy line through selling competitor products, which it did prior to acquiring LeeBoy products. Indeed, LeeBoy asserts that MBR has been selling competitor products, such as Nor-Am and Blaw-Knox, even while it was selling LeeBoy products. (Patsy Decl. ¶ 7.)

Furthermore, at first blush, it might appear that the harm resulting to LeeBoy if the

20

preliminary injunction were granted would not be as great as the harm resulting to MBR if the preliminary injunction were not granted. However, given LeeBoy's grant of exclusive territorial rights to MBR to sell its product, LeeBoy has a large stake in the success of MBR's sales of LeeBoy products. LeeBoy has expressed dissatisfaction with MBR's promotion and sales of its product. Yet, if an injunction were granted, LeeBoy would be forced to continue with a relationship that it finds unsatisfactory. More importantly, one wonders how much effort MBR would put into selling LeeBoy products during the life of the preliminary injunction, knowing full well that its days of being able to sell such products might be numbered and when it could, as an alternative, sell a product that (at least in LeeBoy's opinion) competes with LeeBoy products, e.g., products made by Blaw-Knox.

As such, even assuming that the balance of harms were tilting somewhat in favor of MBR, the balance of harms does not tilt far enough to overcome the previous finding of a negligible likelihood of success on the merits.

## IV. CONCLUSION

In the end, MBR has not demonstrated that a preliminary injunction is warranted in this case. MBR has failed to show: (1) likelihood that it will prevail on the merits of its WFDL claim, (2) that it has no adequate remedy at law, and (3) that it will suffer irreparable harm without injunctive relief. Such being the case, MBR's motion for preliminary injunction will be denied.

**NOW THEREFORE IT IS ORDERED** that the plaintiff's motion for preliminary injunction be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that on February 16, 2007, at 9:00 a.m., a Rule 16 scheduling conference will be conducted in Room 253 of the United States Court House, 517 E. Wisconsin

21

Ave., Milwaukee, Wisconsin, to discuss with the parties the steps necessary to further process this case.

Each party shall follow the procedures set forth in Rule 26 of the Federal Rules of Civil Procedure. In order to assist the court in conducting the Rule 16 conference, your Rule 26(f) report, which is to be filed with the court no later than February 9, 2007, should contain the following additional information:

1. A brief description of the nature of the case, including a statement regarding the basis of subject matter jurisdiction.

2. Whether the parties contemplate amending the pleadings by joining parties or for other reasons.

3. Any motions which are contemplated at this time.

4. The estimated length of trial and whether a jury is requested.

5. Such other matters as may affect the scheduling of this case for final disposition.

Since this case has been designated for electronic filing, documents must be submitted in Portable Document Format (PDF) and shall be filed electronically using the Court's internet-based Electronic Case Files (ECF) system. Registered users may file documents directly into ECF. Please see the Court's web site at wied.uscourts.gov for more information on electronic case filing.

If you are located more than 50 miles from the courthouse, and wish to participate telephonically, please contact Rita Zvers at 414-297-3128 at least one week prior to the scheduling conference with a telephone number where you can be reached at the above scheduled time. The court will initiate the call.

**SO ORDERED** this <u>26th</u> day of January 2007, at Milwaukee, Wisconsin.




<u>/s/ William E. Callahan, Jr.</u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

23